Filed 6/27/13  P. v. Garcia CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICHARD MIGUEL GARCIA,<br><br>    Defendant and Appellant. | F062834<br><br>(Tulare Super. Ct. No. VCF226445C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Patrick O'Hara, Judge.  (Retired Judge of the Tulare Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Peggy A. Headley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Julie A. Hokans, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant/defendant Richard Miguel Garcia, a member of the Norteno gang, was a passenger in a vehicle with three friends who were also Norteno gang members. They had spent several hours at a cemetery, drinking beer and mourning the death of a relative who had been killed by a rival Sureno gang member. As they drove through Orosi, they saw two men walking on the street who were wearing blue, the color claimed by the rival gang. One of the vehicle's passengers shot and killed one of the men; defendant was not the gunman. At trial, the prosecution's gang expert testified the homicide was part of the deadly turf battle between the two gangs in the Cutler-Orosi area.

Defendant was charged and convicted of count I, conspiracy to commit murder (Pen. Code,[1] §§ 182, subd. (a)(1), 187, subd. (a)). In count II, he was found not guilty of the charged offense of first degree murder, and convicted of the lesser included offense of second degree murder as an aider and abettor. The jury also found the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)), and that a principal personally and intentionally discharged a firearm which proximately caused death (§ 12022.53, subds. (d) & (e)(1)). Defendant was sentenced to 50 years to life.

On appeal, defendant raises several instructional issues and contends the jury was incorrectly instructed on conspiracy to commit murder under an implied malice theory; the jury should have been instructed on voluntary and involuntary manslaughter as lesser included offenses of count II; the aiding and abetting language in CALCRIM No. 400 was erroneous; and the gang enhancement instructions were erroneous. Defendant also challenges the evidence in support of his convictions for conspiracy and second degree murder.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

2.

We find that the instructions for conspiracy were incorrect and prejudicial, and reverse that count. We affirm defendant's conviction for second degree murder and the special allegations therein, and correct defendant's sentence.

## FACTS

On the evening of August 28, 2009, two men wearing blue were walking along Avenue 416 in Orosi. There were three other people on the street who were not involved in the shooting, but witnessed the following events.

As the two men in blue walked on the street, a green Honda Accord appeared and pulled up to where the two men were walking. There were four men in the Honda. Someone in the car yelled the word " 'SuRat' " at the two men in blue.

One witness [J.R.] testified that the Honda's driver and the man who was sitting in the front passenger seat got out of the car. They threw cans at the two men in blue.[2] This same witness testified that the man sitting in the Honda's back seat, behind the driver, got out of the car and was holding a gun. The gunman initially aimed the gun at the witness, but then realized the witness was not with the two men in blue. The gunman then turned the weapon at the two men in blue, and fired five or six shots. One of the men fell down. The other man appeared to be hit in the leg, but he was able to escape.

Another witness [G.C.] testified that the gunman got out of the Honda's back seat, and the other three men did not get out of the car or open their doors. The gunman fired five or six shots, one man fell down, and the second man ran away. After firing the shots, the gunman got back into the car, and the Honda left the area at a high rate of speed.

---

[2] On cross-examination, this witness was impeached with his prior statement to the deputies that the man in the front passenger seat, later identified as defendant, did not get out of the car.

## The initial investigation

Around 7:50 p.m., deputies from the Tulare County Sheriff's Department received a dispatch about a gunshot victim on Avenue 416. The deputies found Arturo Bello lying on the road. Bello was dead, and his head was in a pool of blood. He had been wearing a blue tank top, a blue baseball cap, and white tennis shoes with a blue emblem. There were no weapons near him. There was a beer bottle found on the street in the victim's general vicinity.

## Apprehension of suspects

Shortly after the shooting, the deputies received the report that a dark colored Honda was involved. Just after finding the victim's body, the deputies saw a vehicle matching the Honda's description. It was traveling in excess of 75 miles per hour. The Honda passed two deputies traveling in an unmarked patrol unit. The deputies immediately activated the signal lights and siren to conduct a traffic stop. The Honda slowed down and finally stopped.

There were four people in the Honda. Josh Hernandez (Josh) was the driver. Defendant was sitting in the front passenger seat. Santos Hernandez (Santos), Josh's brother, and Rodney "Lance" Zayas were in the back seat.[3]

Josh was wearing a black baseball cap with a red letter "C," and had a red bandana hanging out of his back pocket. Josh had a tattoo on his arm in red ink which said "Hernandez de Catela."

Zayas had a .22-caliber live bullet in his pocket. Zayas also had "X4" and "TC" tattoos, which were gang-related. Santos had a "C" tattoo on his arm, which stood for Catela. Defendant did not have any visible tattoos and was not wearing any red or gang-related attire when he was arrested.

_____

[3] We will refer to Santos and Josh by their first names for ease of reference; no disrespect is intended.

At an in-field showup, one of the witnesses identified Zayas as the gunman, and said the three other suspects had been in the Honda.

**Search of the car**

A Taurus nine-shot .22-caliber revolver was found on the floorboard of the Honda's backseat. It contained one .22-caliber live round but no expended shells. A plastic case was also in the backseat, and it contained a single .22-caliber live round and a cylinder lock. The live rounds which were found in Zayas's pocket, the revolver, and the plastic case were the same brand.

There were two CD cases in the car marked with the words "NorCal" and other northern gang-related words. There were beer bottles in the car.

**Searches of the suspects' residences**

The deputies searched defendant's bedroom in his mother's house and found a Blackberry cell phone with gang photographs; a school group photo which depicted one person throwing a "four" sign and had derogatory phrases about the southern gang written on it; and other papers with gang letters on them. Defendant shared the bedroom with his brother, and the cell phone belonged to his brother.

When the deputies searched Josh's house in Bakersfield, they found a coffee mug with a drawing of the Huelga bird, the words "Catela, BPC," drawings of the "smile now, cry later" masks, and it said: " 'F*** those who oppose.' " There was a photograph of Josh "throwing up" a "four" sign with a red rag, signifying the Norteno gang.

Detective Crystal Derington testified that "Brown Pride Catela" was a northern gang in Cutler, and the words on the mug were "basically calling out their rival saying that they'll take care of business and do what it takes to stand their ground and take control of their territory .…"

Zayas's house in Orosi was searched, and the deputies found a .12-gauge Mossberg semiautomatic shotgun under the dresser in Zayas's bedroom. It contained

5.

five shotgun shells.  There was red clothing in Zayas's bedroom closet.  The deputies also found three letters from jail inmates and a page of gang-rap lyrics.

## The fatal gunshot wound

The victim suffered two gunshot wounds.  The fatal wound entered his upper lip, just below his nose.  The bullet traveled front to back, slightly downward, and slightly right to left.  It fractured the victim's teeth[4] on his upper jaw, continued through the airway in the back of the mouth, severed the brain stem from the spinal cord, and went through the base of the skull.  There was a fragment exit wound on the back of his scalp.  A small caliber bullet fragment with rifling marks was recovered from his neck.  This bullet wound was "immediately" fatal.

The victim had a second gunshot wound which entered the right side of his back.  The bullet's trajectory was at an angle – slightly back to front, upward, and slightly left to right.  The bullet hit the liver, entered the right chest cavity, and hit a rib.  There was no exit wound.  A deformed, small caliber bullet with rifling marks, and bullet fragments were recovered from the victim's body.

There were multiple abrasions on the victim's face and body.  The victim's blood-alcohol level was 0.18 percent, and there was evidence that he had ingested marijuana.

## Defendant's first statement

At 7:32 a.m. on August 29, 2009, Detective Zaragoza conducted a videotaped interview with defendant.  He advised defendant of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and defendant agreed to answer questions about the homicide.[5]  Defendant, who was 23 years old, said Josh picked him up the previous

---

[4] Several teeth were found on the street near the victim's body.

[5] The videotapes of defendant's two interviews were played for the jury and not transcribed by the court reporter.  The prosecution apparently prepared transcripts for the jury to review during trial, but the transcripts were not introduced into evidence or

day, and Zayas and Santos were in the car. Josh drove them to a cemetery, where they visited the grave of Josh's brother. They stayed there for about two hours and drank beer. Defendant said they left the cemetery in Josh's car. They were driving through Orosi when defendant fell asleep. Defendant said when he woke up, the deputies were behind Josh's car to conduct the traffic stop. Defendant said he did not know anything about a homicide, he did not do anything wrong, and he fell asleep after they left the cemetery. At the end of the interview, Detective Zaragoza told defendant he was going to be booked into jail and asked if he claimed membership in a gang. Defendant said he was not involved in any gangs, and he could be housed in general population in the jail.

While not depicted on the videotape, Detective Zaragoza testified that defendant was "dry heaving" into a waste basket for about 10 to 15 minutes at the beginning of the interview, but he was coherent and did not appear under the influence. The videotape reflects that defendant was calm and polite during the interview.

**Defendant's second statement**

Around 9:00 a.m. on the same day, defendant asked to speak to the detectives again, and said he had been too scared to tell the truth. Detective Zaragoza conducted another videotaped interview. Defendant was again advised of the *Miranda* warnings, and defendant said he wanted to talk to Zaragoza. Defendant was very calm and polite during the interview.

Defendant said he lied during the first interview to protect Zayas, and that Zayas fired the gun. Defendant said they left the cemetery in Josh's car. Josh was driving, defendant was in the front passenger seat, and Zayas and Santos were in the back seat.

---

included in the record. Our summary is based on our review of the videotapes themselves, introduced as exhibit Nos. 69 and 70.

Defendant said there were two men walking on the street, and they were wearing blue. Josh drove past them, then turned the car around and pulled up right next to them. Defendant said they did not yell at the men but "we all recognized them."

Detective Zaragoza asked defendant, "Who came up with the idea to go mobbing?"[6] Defendant replied: "Well, we all did but we never thought that that was going to happen." Defendant said they had decided to have a barbeque, but first they were going to do a little mobbing. They were driving around and "one thing led to another."

On further questioning, defendant said that Zayas was the person who said they should go mobbing. Defendant said he never agreed to go mobbing but admitted that he remained in the car. Defendant said Zayas always had the gun, but defendant claimed he did not know about the gun before the shooting.

Detective Zaragoza asked defendant if going mobbing meant they were going to look for southerners. Defendant said, "Not necessarily," and that it could mean that they were going to look for someone or just drive around and cruise. Defendant denied that the Surenos were their targets.

Defendant said Zayas started firing the gun. Defendant said no one else got out of the car. Defendant thought Zayas fired five or six shots. Defendant said everyone in the car was stunned that Zayas had a gun and fired the shots.

Defendant said that after Zayas finished shooting, Zayas got back in the car and said, " '[L]et's get the f*** out of here,' " and " 'I got 'em, I got 'em.' " Josh took off for Orosi, but the deputies stopped them.

---

**6** As we will explain *post*, the prosecution's gang expert testified that "mobbing" meant "to get together" in a vehicle, look for a rival gang member, and take action against that person.

Detective Zaragoza asked defendant if he was a Norteno. Defendant said no. Defendant said he lived in Cutler, that there were a lot of northerners, and some were his friends. Defendant said some people were gangbangers, and he "kicked it" with them, but claimed he was not in a gang.

Defendant said he "kicked it" with Santos, Josh, his brothers and cousins. Defendant knew Santos and Josh were northerners. Defendant was asked: "Do you kick it with northerners?" Defendant nodded his head, "[Y]es." Defendant was asked, "[W]hich clique?" Defendant said: "I was never in a clique. I just hung around with them."

Defendant said he hung around with Santos, Josh, and with "BPC." Defendant was asked, "[H]ow long you been kicking it with them?" Defendant replied: "A long time … seven or eight years."

"Q.     So you kick it with the BPC, the northerners?

"A.     Yeah."

Defendant was repeatedly asked if he knew Zayas had a gun before the shooting. Defendant eventually admitted that "we knew" Zayas had a gun before the shooting, because Zayas picked up the gun at his house. Defendant explained they left the cemetery and drove to Zayas's house. Zayas went into the house and then returned to Josh's car. Defendant said when Zayas got into the car, he showed them that he had a gun, and it was a chrome .22- or .25-caliber revolver. Defendant admitted he had seen Zayas with a gun on other occasions. Defendant said they carried guns to feel safe from the southerners.

Defendant repeatedly denied that he touched the gun. When asked if his fingerprints could be on the gun, defendant said they might be. Defendant then added there was a "big possibility" that he touched the gun, but he could not remember since he was drunk that night.

9.

Defendant admitted that southerners had once shot at him. He knew that southerners had shot Josh a couple of times. Defendant also knew that Zayas's brother had been murdered by a southerner in a gang-related shooting.

As the interview continued, defendant was asked if anyone in the car said they should look for southerners. Defendant said that Zayas said, " '[H]ey, f***, let's go look for some scraps.' " Defendant said they "ran into those guys," and Zayas said they were "scraps." Defendant admitted that he said, "[F]*** 'em" when he saw the two men on the street.

Defendant said Zayas got out of the car, fired the shots, got back into the car, and said, " 'I got 'em, I got 'em.' " Defendant said Zayas meant he got the southerner he had shot. Josh and Santos said, " '[L]et's jam.' " Defendant said, "Let's get the f*** out of here."

Defendant was asked what they talked about in the car before the traffic stop. Defendant said they were all "tripping out." Zayas was scared, and he wanted defendant to run away with the gun. Defendant said no because he didn't shoot the gun.

"Q. You've been a northerner for what, eight years…?

"A. Not anymore since today. F*** that. I don't need this shit, man."

Defendant said he wanted "witness protection" and did not want to be involved with gangs.

## PROCEDURAL HISTORY

Defendant, Josh, Santos, and Zayas were jointly charged with count I, conspiracy to commit murder (§§ 182, subd. (a)(1) & 187); count II, first degree murder of Bello (§ 187, subd. (a)), with a special circumstance that the offense was committed by active

10.

participants in a criminal street gang (§ 190.2, subd. (a)(22)); and count III, attempted murder of the second man (§§ 664/187, subd. (a)).[7]

As to all counts, it was alleged that a principal personally and intentionally discharged a firearm which proximately caused death (§ 12022.53, subds. (d), (e)(1)); and the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). As to count II, murder, it was separately alleged that codefendant Zayas personally used a firearm (§ 12022.5, subd. (a)(1)).

Defendant pleaded not guilty. The court granted the prosecutor's motions to sever defendant's trial from the three codefendants, and to dismiss count III, attempted murder, against defendant.

After a separate jury trial, Zayas was found not guilty of first degree murder, and guilty of the lesser included offense of second degree murder with a firearm and gang enhancements. He was found not guilty of attempted murder. Zayas was sentenced to 40 years to life. (*People v. Zayas* (F062556) filed 6/21/2012)

Santos pleaded no contest to voluntary manslaughter and the gang enhancement, with an indicated sentence of 16 to 21 years in prison. The record is silent as to the disposition of the charges against Josh.

Defendant was tried separately for count I, conspiracy to commit murder, and count II, first degree murder with a special circumstance, and the special allegations. Santos testified for the prosecution at defendant's jury trial. Santos stated that he was concerned for his safety and considered a "rat" by the Nortenos because he was testifying against defendant.

---

[7] While defendant was charged with murder with a special circumstance, the prosecutor announced that she would not seek the death penalty.

11.

## SANTOS'S TRIAL TESTIMONY

Santos testified that he had been a member of the North Side Cutler Norteno gang, but he was no longer in a gang. The Nortenos lived in Cutler while the Surenos, their rivals, lived in Orosi. Santos had an "X-4" tattoo on his arm which meant 14, the number claimed by the Nortenos.

Santos testified he did not know if his brother, Josh, had also been a member of the Nortenos, but admitted that Josh hung out with him, and he was involved with the Nortenos. Santos and Josh had been shot at on previous occasions by members of the Sureno gang. Santos testified that Zayas was also a member of the Nortenos.

Santos had known defendant for 10 years. They worked together and frequently drank and went to parties together. Santos did not know if defendant was involved with a gang. Santos did not talk about his own gang status with defendant, but "everybody knew that I was" in the gang.

## The cemetery

Santos testified that on the morning of August 28, 2009, he and his wife went to the cemetery in Sultana to visit the grave of his younger brother, who had died in a car accident. Josh arrived separately in his Honda. Santos's wife left, and Santos and Josh remained at the cemetery. Santos and Josh drank beer and cried about their brother.

While Santos was at the cemetery, he received a call from Zayas. Santos told Zayas where they were. Around 1:00 p.m., Zayas arrived at the cemetery. Zayas's older brother was also buried there. Santos knew that Zayas's brother had been shot and killed by South Siders.

Santos testified they called defendant while they were still at the cemetery, because they wanted to arrange a barbeque. They left the cemetery, drove to defendant's house, and picked him up. They bought more beer, and then returned to the cemetery.

Santos testified the four men stayed at the cemetery and drank beer. Zayas was angry and upset as he thought about his brother.

12.

### Zayas retrieves the gun

Santos testified that around 6:00 p.m., they left the cemetery in Josh's Honda. Josh was driving, defendant was in the front seat, and Santos and Zayas were in the back seat.

Josh drove the group to Zayas's house in Orosi so Zayas could get some money for food. Zayas went into the house while the other men stayed in the car and continued to drink.

Santos testified that when Zayas returned to the car, he had a revolver in his waistband. Santos was surprised to see the gun. Josh briefly took the gun from Zayas to make sure it was not loaded. Santos and defendant did not hold the gun.

Santos testified that Zayas said, " 'Let's go for a ride,' " and used the term "mobbing." Santos believed that Zayas was "mad, looking for trouble" with South Siders. Santos knew the term "Scrap hunting" meant mobbing with a gun. Santos testified that everyone in the car knew Zayas had a gun. Santos thought Zayas was just looking for a fight. Santos testified none of them tried to get out of the car. Josh continued driving, and they all agreed to drive to Orosi to go mobbing.

### The shooting

Santos testified they drove around Orosi looking for Scraps. Zayas saw "two guys" wearing blue hats who were walking on Avenue 416. Josh drove past the two men and Zayas yelled something at them. Defendant swore at the two men. The two men yelled something back, and they threw something at Zayas.

Santos testified Josh turned the car around and drove up to the two men. Zayas got out of the car and fired shots at them. Santos testified it happened very quickly. Santos, Josh, and defendant stayed in the car. Zayas fired five or six rounds. Santos could not tell if he hit anyone.

Zayas got back into the car and said, " 'I think I got one.' " Santos testified that he had no idea that Zayas was going to shoot anyone. Josh and defendant were shocked

13.

about what Zayas did. Santos testified that Zayas shot a Sureno because he was mad that a Sureno killed his brother.

Josh immediately drove away from Orosi. No one in the car said anything. The deputies pursued them. When the deputies appeared behind their car, Zayas looked scared and told defendant to take the gun and run away. Defendant refused and Josh stopped the car.

Santos testified that after he was arrested, he was placed in a patrol car with defendant. Santos told defendant that he was going to claim he was drunk. Defendant did not say anything. Santos testified that when he was initially interviewed, he claimed he was drunk and passed out. However, he later told the detectives what happened in the car.

## GANG EXPERT'S TESTIMONY

Tulare County Sheriff's Detective Steven Sanchez was assigned the North County Gang Violence Special Unit. He testified the Norteno gang claimed the color red and the number 14. The letters "TC" were a local Norteno tattoo which meant Tulare County. Other Norteno tattoos included "X4" for 14, and the Huelga bird.

The Norteno subset gangs in Tulare County included the Brown Pride Catela (BPC), North Side Catela, and East Side Orosi.[8] There were over 150 Norteno gang members in the Cutler-Orosi area. The primary activities of the Norteno gang included homicide, attempted homicide, robbery, carjacking, and felony graffiti. One of the goals of the gang was to instill fear of retaliation.

The Surenos were the rivals of the Nortenos and claimed the color blue and the number 13. A derogatory name for the Surenos was Scraps.

---

[8] Another officer testified that Brown Pride Catela was the predominant Norteno gang in the area.

14.

Detective Sanchez testified that gang members gain respect by being feared in the community. When they are disrespected, they will be seen as weak unless they respond. They could be disrespected by rival gang members yelling their names or tagging graffiti in their turf. Gang members will typically commit offenses in front of fellow gang members. They will achieve greater status within their gang if they commit violent crimes. It is a sign of betrayal for a gang member to testify against another gang member.

**"Mobbing"**

Detective Sanchez testified there was a Norteno turf war in the Cutler-Orosi area. Surenos claimed Orosi while Nortenos claimed Cutler, and the two towns were separated by one street. The violence between the two gangs had escalated within the past five years because each gang was trying to claim the other city as their turf.

Sanchez explained that "mobbing" meant "to get together" in a vehicle, look for a rival gang member, and take action against that person. It was common for gang members to go mobbing and look for their rivals. Detective Sanchez did not know if it was common for gang members to have a weapon while they were mobbing. "Scrap hunting" meant that a Norteno was looking for a rival Sureno.

**Predicate offenses**

Detective Sanchez testified about two predicate offenses involving members of the Norteno gang in Tulare County. Robert Clevenger and Enrique Gonzalez, members of BPC, were convicted of committing an assault with a deadly weapon in May 2007. They were driving around in the Orosi area, confronted two Surenos, and Gonzalez opened fire on the Surenos. The participants in the other predicate offense were Javier Sahagun, Humberto Melchor, and George Lua, also members of BPC, who were convicted of committing an assault with a deadly weapon in October 2008. They had been in a car which opened fire on a Sureno in Cutler.

**Gang status**

Detective Sanchez testified that in order to validate a person as a gang member, law enforcement officers rely on certain criteria. Based on such criteria, Zayas was a validated member of the Norteno gang: he had previously associated himself with the Nortenos when he was booked into jail, he had gang-related tattoos, and gang-related items were found at his house. Josh was also a validated Norteno and member of BPC. Josh often associated with Zayas. Josh was wearing Norteno clothing and colors when he was stopped after the shooting, he had gang-related tattoos, and gang indicia was found at his house. Santos was a validated gang member and admitted being a member of North Side Catela.

Detective Sanchez testified that defendant did not possess any gang indicia when he was arrested in this case. The officers did not find any weapons or gang-related attire when they searched defendant's house. Defendant has a tattoo of his last name on his leg. It was common for gang subjects to have such tattoos, but Sanchez conceded it was not a gang-related tattoo.

Detective Sanchez conceded that as of the day before the homicide in this case, defendant did not meet any of the criteria used to validate a person as a gang member. He was unable to locate any field interview or crime reports about defendant.

However, Sanchez testified that someone could be validated as a gang member by meeting the gang criteria based on one actual crime committed by that person. Sanchez believed defendant was a validated Norteno and part of BPC *as of the date of the shooting* because he admitted gang membership during his interview with Detective Zaragoza; he associated with gang members; he was involved in a gang-related crime; and he possessed gang indicia, gang writings, and gang photographs at his house.

When defendant was booked in this case, defendant said he did not have any known enemies. However, the intake officer who interviewed defendant reported that

defendant said he was a Norteno dropout, and had known enemies in custody from both southern and northern sides.

Detective Sanchez testified that when defendant was interviewed by the officers about the homicide, he admitted that he had been associated with BPC for approximately eight years. He never claimed to be a dropout. Defendant also admitted that he "kicked it" with " 'these guys,' " identified as Santos, Josh, and their cousins. Defendant told the detectives that Zayas picked up the gun from his house, that it was Zayas's idea to go mobbing, and defendant knew they were going to go out and "look for some Scraps." Defendant said that he saw the two men walking down the street, and he thought they were Surenos. Defendant admitted that he said, " '[F]*** 'em.' " Detective Sanchez testified such a phrase meant to assault the rivals.

Sanchez testified the items found in defendant's bedroom were also indicative of Norteno gang membership, including the photograph with "BPC" written on it, along with the words, " 'gang that all his Scraps belong 6 feet under.' " Some of the people in the photograph were "X-ed" out in blue ink. Sanchez testified it was common to find yearbooks which belonged to gang members, where they had crossed out the pictures of rival gang members. Sanchez admitted that he did not know if defendant wrote the gang language on the photograph. The Blackberrry cell phone, which belonged to defendant's brother, contained a photograph that depicted defendant with six individuals, posing with a marijuana plant. Some of the subjects were flashing Norteno gang signs. However, defendant was not flashing a gang sign.

**Hypothetical question**

The prosecutor asked Detective Sanchez a hypothetical question about four Nortenos who visit the cemetery and talk about a relative who was killed by a Surenos. They decide to go mobbing, and the surviving relative picks up his gun. They drive around and see two guys wearing Sureno blue. The Nortenos shout out gang slurs, the two guys in blue yell something in return. The driver makes a U-turn and pulls up to

17.

where the two guys are walking. The gunman shoots at both men in blue, and he kills one of them.

In response, Detective Sanchez testified that such a high-profile assault would be committed for the gang's benefit, and boost the gang members' status within the gang. "Also, it continues the war on the streets between the North and South, especially in the Cutler-Orosi area[,]" and this one incident would "fuel ten other incidents that happen in the future because of this. It's going to continue the gang war. It also sends a message to the rivals that one gang is particularly responsible for doing the shooting."

## DEFENSE EVIDENCE

Scott LaFleur had been defendant's high school English teacher in the late 1990s. LaFleur described defendant as a great kid, and he was shocked to hear about the charges against him.

Manuel Lopez lived next to defendant in Cutler and had known him for 15 years. Lopez described defendant as a quiet person who was not violent. Lopez was also surprised when he heard about this case. Lopez never knew defendant to be involved with gangs.

### Defendant's trial testimony

Defendant testified that he hung around with Josh and Santos. He knew they were Nortenos, but testified that they had a social relationship. On the day of the shooting, they picked him up and drove to the cemetery where they drank beer and smoked marijuana. Defendant said he did not know Zayas's brother, but knew he had been shot by rival gang members.

Defendant testified that they drove to Zayas's house to pick up money for a barbeque. Zayas returned to the car and showed them a gun. Josh took the gun away from Zayas to make sure it was not loaded. Defendant became concerned and asked Josh to take him home. However, defendant did not try to leave.

18.

Defendant testified that "mobbing" meant drinking, smoking weed, and driving slowly. He admitted that mobbing could lead to trouble. Defendant saw the two men in blue walking down the street. Defendant pretended not to see them, but Zayas started yelling and exchanging words with them. Defendant told Josh to keep driving, but he did not tell Josh to pull over and let him out.

Defendant testified Josh turned around and drove up to the two men. Zayas got out of the car and started shooting. Defendant never thought Zayas would shoot anyone, and he was shocked when Zayas opened fire. After the shooting, defendant said, " 'Let's get the f*** out of here[,]' " because he had nothing to do with it. Defendant did not want to wait for the police to arrive, because he was afraid that Zayas might believe he was a "rat" and kill him too.

Defendant testified that he was not completely honest when he was initially interviewed in this case. He was shocked, sick, and afraid, and he was trying to protect Zayas. Defendant felt scared and pressured by the gang investigators. Defendant decided to ask for the second interview to clear things up.

Defendant admitted that he lied during his interviews with the officers. During one of the interviews, he said that he might have touched the gun in the car. He only said that because he felt pressured by the officers. Defendant testified that he never touched the gun. Defendant admitted that he also told the officers that he said, " '[F]*** em,' " when he saw the two men walking on the street. However, defendant testified he never actually said that when he was in the car.

Defendant knew Josh, Santos, and Zayas were Nortenos, and he got into the car that day with three known Nortenos. Defendant admitted that he said he "kicked it" with Josh and Santos, but he never said he was a Norteno or in BPC, and he had never been in a gang.

19.

Defendant testified the school photograph found in his bedroom belonged to a friend, and someone else wrote on the picture. Defendant claimed that the officers "labeled" him as a Norteno dropout.

**Verdicts and sentence**

Defendant was convicted of count I, conspiracy to commit murder. In count II, he was found not guilty of first degree murder, but guilty of second degree murder as a lesser included offense. The jury found the firearm and gang enhancements true. He was sentenced to 50 years to life.

## DISCUSSION

### I. Instructions for conspiracy to commit murder

Defendant contends his conviction in count I for conspiracy to commit murder must be reversed because the conspiracy instructions referred the jury back to the murder instructions, and the murder instructions included an implied malice theory. Defendant correctly notes that a conviction for conspiracy to commit murder must be based on express malice and cannot be based on an implied malice theory. Defendant argues that the instructions incorrectly permitted the jury to convict him of conspiracy based on an implied malice theory, and the instructional error was prejudicial. We agree and must reverse his conviction in count I.

#### A. Murder

"Murder is the unlawful killing of a human being ... with malice aforethought." (§ 187, subd. (a).) Murder is divided into first and second degree murder. (§ 189; *People v. Chun* (2009) 45 Cal.4th 1172, 1181.) First degree murder is a "willful, deliberate, and premeditated killing." (§ 189.)

"Second degree murder is defined as the unlawful killing of a human being *with malice aforethought,* but without the additional elements – i.e., willfulness, premeditation, and deliberation – that would support a conviction of first degree murder. [Citations.]" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102, italics in original; *People*

20.

*v. Swain* (1996) 12 Cal.4th 593, 600 (*Swain*).)  There are three theories of second degree murder:  unpremeditated murder with express malice; implied malice murder; and second degree felony murder.  (*Swain, supra,* 12 Cal.4th at p. 601.)

Malice aforethought "may be express or implied."  (§ 188.)  Malice may be, and usually must be, proved by circumstantial evidence.  (See *People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946; *People v. James* (1998) 62 Cal.App.4th 244, 277.)

Malice is express " 'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.…' "  (*Swain*, *supra*, 12 Cal.4th at p. 600; *People v. Nieto Benitez, supra,* 4 Cal.4th at p. 102.)  "Express malice murder requires an intent to kill.  [Citations.]"  (*People v. Bohana* (2000) 84 Cal.App.4th 360, 368.)

Malice is implied " 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation].…"  (*People v. Lasko* (2000) 23 Cal.4th 101, 107; *Swain*, *supra*, 12 Cal.4th at p. 602.)  Implied malice does not require an intent to kill.  (*Lasko*, *supra*, 23 Cal.4th at p. 107; *People v. Bland* (2002) 28 Cal.4th 313, 327.)

> "[A]ll murders require, at the core of the corpus delicti of the offense, a 'killing.'  [Citations.]  … But only in the case of *implied malice* murder is the requisite mental state – malice aforethought – implied from the specific intent to do some act *other than* an intentional killing *and* the resulting circumstance:  a killing that has in fact occurred as 'the direct result of such an act.'  [Citation.]"  (*Swain*, *supra*, 12 Cal.4th at p. 603, italics in original.)

### B.  Conspiracy

The crime of conspiracy is defined as " 'two or more persons conspir[ing]' '[t]o commit any crime,' together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance thereof.  [Citations.]"  (*Swain*, *supra*, 12 Cal.4th at p. 600.)  Conspiracy is a specific intent crime requiring both an intent to agree or conspire, and a further intent to commit the target crime or object of the

21.

conspiracy. (*Ibid*.; *People v. Cortez* (1998) 18 Cal.4th 1223, 1232 (*Cortez*).) " 'To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree *but also that they intended to commit the elements of that offense*.' [Citation.]" (*Swain*, *supra*, 12 Cal.4th at p. 600, italics added in original.)

## C. *Swain* and conspiracy

In *Swain*, the California Supreme Court addressed the type of murder which would support a conviction for conspiracy to commit murder. *Swain* held that a conviction of conspiracy to commit murder requires a finding of intent to kill, i.e., express malice, "and cannot be based on a theory of implied malice." (*Swain*, *supra*, 12 Cal.4th at p. 607.) The court further held that conspiracy to commit murder cannot be based on the underlying criminal objective or target offense of second degree implied malice murder. (*Id*. at p. 603.)

*Swain* explained that conspiracy is an inchoate crime that does not require the commission of the substantive target offense that is the object of the conspiracy, and that " '[a]s an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime,' and 'thus reaches further back into preparatory conduct than attempt ....' [Citation.]" (*Swain, supra,* 12 Cal.4th at p. 600.) As to the target offense of murder, *Swain* explained that unlawful intent to kill is the functional equivalent of express malice. (*Id.* at p. 601.)

> "[C]onspiracy is a specific intent crime requiring an intent to agree or conspire, and a further intent to commit the target crime, here murder, the object of the conspiracy. Since murder committed with intent to kill is the functional equivalent of *express malice* murder, conceptually speaking, no conflict arises between the specific intent element of conspiracy and the specific intent requirement for such category of murders. Simply put, where the conspirators agree or conspire with specific intent to kill and commit an overt act in furtherance of such agreement, they are guilty of conspiracy to commit express malice murder...." (*Id.* at p. 602, italics in original.)

*Swain* explained that the same reasoning did not apply where the underlying objective of the conspiracy is second degree implied malice murder. "*Implied malice murder*, in contrast to express malice, requires instead an intent to do some act, the natural consequences of which are dangerous to human life. '*When the killing is the direct result of such an act*,' the requisite mental state for murder – malice aforethought – is implied. [Citation.] In such circumstances, '... it is not necessary to establish that the defendant intended that his act would result in the death of a human being.' [Citation.] Hence, under an *implied malice* theory of second degree murder, the requisite mental state for murder – malice aforethought – is by definition 'implied,' as a matter of law, from the specific intent to do some act dangerous to human life *together with the circumstance that a killing has resulted from the doing of such act*." (*Swain, supra,* 12 Cal.4th at pp. 602-603, italics in original.)

> "It is precisely due to this nature of *implied malice* murder that it would be *illogical* to conclude one can be found guilty of conspiring to commit murder where the requisite element of malice is implied. Such a construction would be at odds with the very nature of the crime of conspiracy – an 'inchoate' crime that 'fixes the point of legal intervention at [the time of] agreement to commit a crime' ... – precisely because commission of the crime could never be established, or deemed complete, unless and until a killing actually occurred." (*Id*. at p. 603, italics in original.)

In *Swain*, one defendant was convicted of second degree murder and conspiracy to commit second degree murder, and his codefendant was convicted of conspiracy to commit second degree murder. *Swain* reversed the defendants' convictions for conspiracy to commit murder, and held the jury instructions were prejudicial, because the jury was instructed on both express and implied malice murder as to the conspiracy charge. *Swain* held the implied malice instructions would have allowed the jury to find malice without a finding an intent to kill, and the jury returned general verdicts which did

23.

not reveal whether it returned the conspiracy convictions based on express malice. (*Swain*, *supra*, 12 Cal.4th at p. 607.)

*Swain* held the error was not harmless under *Chapman* v. *California* (1967) 386 U.S. 18, because it could not be determined beyond a reasonable doubt "that the erroneous implied malice murder instructions did not contribute to the convictions on the conspiracy counts. Nor is there anything else discoverable from the verdicts that would enable us to conclude that the jury necessarily found the defendants guilty of conspiracy to commit murder on a proper theory, i.e., based on express malice or intent to kill[,]" since one defendant was convicted of second degree murder, which could have been based on implied malice, and the other defendant was found not guilty of murder. (*Swain*, *supra*, 12 Cal.4th at p. 607.)

The California Supreme Court has reaffirmed that "all conspiracy to commit murder is necessarily conspiracy to commit murder of the first degree .…" (*Cortez*, *supra*, 18 Cal.4th at pp. 1231-1232.)

> "[W]here two or more persons conspire to commit murder – i.e., intend to agree or conspire, further intend to commit the target offense of murder, and perform one or more overt acts in furtherance of the planned murder – each has acted with a state of mind 'functionally indistinguishable from the mental state of premeditating the target offense of murder.' [Citation.] The mental state required for conviction of *conspiracy* to commit murder necessarily establishes premeditation and deliberation of the target offense of murder – hence all murder conspiracies are conspiracies to commit first degree murder, so to speak." (*Id*. at p. 1232, italics in original.)

"[T]he mental state required for conviction of conspiracy to commit express malice murder *necessarily equates with and establishes* the mental state of deliberate and premeditated first degree murder." (*Ibid.*, fn. 3, italics added.)

CALCRIM No. 563 defines the elements of conspiracy to commit murder. After *Swain* was decided, the bench notes for CALCRIM No. 563 were revised to state:

> "Do not cross-reference the murder instructions unless they have been modified to delete references to implied malice. Otherwise, a

24.

reference to implied malice could confuse jurors, because conspiracy to commit murder may not be based on a theory of implied malice. [Citation.]" (Bench Note to CALCRIM 563 (2013) Vol. I, p. 363.)

With *Swain*'s holding in mind, we turn to the charges, instructions, and convictions in this case.

**D.  Background**

As to count I, conspiracy to commit murder, the jury was instructed with CALCRIM No. 563, as to the elements of that offense:

"To prove the [defendant is] guilty of this crime, the People must prove, one, the defendant intended to agree and did agree with Rodney Zayas, Joshua Henandez, and Santos Hernandez to *intentionally and unlawfully kill.*

"Two, at the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would *intentionally and unlawfully kill.*

"Three, the defendant, or Rodney Zayas or Joshua Hernandez, or Santos Hernandez, or all of them committed at least one of the following overt acts alleged to have accomplished the killing:  Leaving cemetery, pickup handgun, agreed to drive to Orosi to go mobbing for Surenos, identity Surenos, made U-turn in car, drive back towards Surenos, exit car, and aim gun at the two Surenos walking down the sidewalk, and shoot and kill one of the Surenos.  And … four, at least one of these overt acts was committed in California.

"To decide whether the defendant committed these overt acts, consider all of the evidence presented about the acts.

"*To decide whether the defendant and one or more of the other alleged members of the conspiracy intended to commit murder, please refer to the instructions which define that crime.*

"*The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder….*"  (Italics added.)

As to count II, first degree murder, the jury was fully and correctly instructed with the definitions of first and second degree murder, premeditation, malice aforethought, and express and implied malice.  (CALCRIM Nos. 500, 520 & 521.)  The jury was instructed

25.

that defendant was guilty of first degree murder if the People proved he acted willfully, deliberation, and with premeditation, and he acted willfully if he intended to kill. "All other murders are of the second degree."

### E. Analysis

Defendant contends that CALCRIM No. 563, as given in this case, permitted the jury to find him guilty of conspiracy to commit murder based on the legally incorrect theory of implied malice murder. Defendant argues that CALCRIM No. 563 instructed the jury to rely on the murder instructions for the definition of that offense, and that the entirety of the murder instructions permitted the jury to convict defendant based on an implied malice theory of second degree murder, as prohibited by *Swain*.

The People contend that defendant waived any instructional error because he failed to object to CALCRIM No. 563 on any basis. We disagree. "Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review. [Citations.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) Defendant has not forfeited his right to raise this issue on appeal to the extent the purported error affects his substantial rights. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7; *People v. Van Winkle* (1999) 75 Cal.App.4th 133, 139.)

The People concede that CALCRIM No. 563 referred the jury to the murder instructions, and the murder instructions allowed the jury to find defendant guilty based on the theory of second degree murder based on implied malice. However, the People contend the instructions complied with *Swain* because CALCRIM No. 563 expressly stated that a conviction for conspiracy required the jury to find that defendant and one of his coconspirators intended to kill.

The People are correct that the definitional paragraphs of CALCRIM No. 563 stated that the People had to prove that defendant agreed with Zayas, Josh, and Santos "to *intentionally* and unlawfully kill," that defendant and one or more of the other alleged coconspirators intended that one or more of them would "*intentionally* and unlawfully

26.

kill," and that the members of the alleged conspiracy "had an agreement and *intent* to commit murder." (Italics added.)

While "intent to kill" language was included in one portion of CALCRIM No. 563, the People concede the instruction also stated:

> "To decide whether the defendant and one or more of the other alleged members of the conspiracy *intended to commit murder, please refer to the instructions which define that crime.*" (Italics added.)

Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury. (*People v. Wilson* (1992) 3 Cal.4th 926, 943; *People v. Holt* (1997) 15 Cal.4th 619, 677.) The jury in this case was expressly instructed to rely on the definitional instructions for murder to determine whether defendant had the requisite intent to be convicted of the offense of conspiracy to commit murder. The murder instructions correctly defined first and second degree murder, and express and implied malice.

As in *Swain*, however, the entirety of the instructions erroneously permitted the jury to find defendant guilty of conspiracy to commit murder based on an implied malice theory of murder. The CALCRIM No. 563 instruction should have been modified to comply with *Swain* and clarify that while the murder instructions defined the underlying offense, the jury could only convict defendant of conspiracy to commit murder based on express malice, and not on implied malice.

Also, as in *Swain*, we cannot find the instructional error harmless beyond a reasonable doubt because of the nature of the verdicts in this case. The jury returned a general verdict that defendant was guilty of conspiracy to commit murder, without specifying whether that conviction was based on express or implied malice. More importantly, however, the jury found defendant not guilty of first degree premeditated murder, and guilty of the lesser included offense of second degree murder.

The instructional error would have been harmless if defendant had been convicted of first degree murder, since that conviction would have been based on express malice. Defendant's conviction for second degree murder could have been based on either an express or implied malice theory. (*Swain, supra,* 12 Cal.4th at p. 601.) Nevertheless, the California Supreme Court has clarified that there is no viable offense of " 'conspiracy to commit express malice "second degree" murder,…' " (*Cortez, supra,* 18 Cal.4th at p. 1230.) Given the nature of the jury's verdicts in this case, we are compelled to reverse defendant's conviction in count I for conspiracy to commit murder under the direction of *Swain.*[9]

## II.    <u>Substantial evidence for conspiracy to commit murder</u>

Defendant contends there is insufficient evidence to support his conviction in count I for conspiracy to commit murder because he did not have the requisite specific intent to kill the victim as required in *Swain*; he did not enter into any agreement with Zayas or the others to murder anyone; there is no evidence that their agreement to go mobbing meant that a murder would occur; defendant and Santos testified they were shocked when Zayas shot the victim; and defendant's mere presence at the scene does not constitute intentional participation in a conspiracy.

While we have reversed defendant's conspiracy conviction, that reversal was based on prejudicial instructional error which would not bar retrial on that count. We must thus determine whether defendant's conspiracy conviction is supported by substantial evidence, separate and apart from the instructional error in this case.

---

[9] Given our reversal of count I for instructional error, we need not address defendant's contention that the jury should have been instructed on lesser included offenses for conspiracy.

## A.  Substantial evidence

When a criminal conviction is challenged as lacking evidentiary support, "… the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  "The same standard applies when the conviction rests primarily on circumstantial evidence.  [Citation.]"  (*Ibid.*)  "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

## B.  Conspiracy to commit murder

"A conspiracy exists when one or more persons have the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act by one or more of the parties to such agreement in furtherance of the conspiracy.  [Citations.]  These facts may be established through the use of circumstantial evidence.  [Citations.]  They may also ' "be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.  [Citations.]" '  [Citations.]"  (*People v. Herrera* (2000) 83 Cal.App.4th 46, 64.)

As explained above, a conviction for conspiracy to commit murder requires a finding of intent to kill, i.e., express malice, "and cannot be based on a theory of implied malice."  (*Swain*, *supra*, 12 Cal.4th at p. 607.)  In this case, defendant was found not guilty of first degree premeditated murder, but guilty of second degree murder as a lesser included offense; the verdicts are silent as to whether the jury's finding of second degree murder was based on express or implied malice.

29.

A conviction for unpremeditated second degree murder may be based on express malice. (*Swain, supra,* 12 Cal.4th at p. 601.) We have explained that after Swain, the California Supreme Court clarified that there is no viable offense of " 'conspiracy to commit express malice "second degree" murder,…' " (*Cortez, supra*, 18 Cal.4th at p. 1230.) However, defendant's conviction for second degree murder does not mean that, as a matter of law, he could not have been convicted of conspiracy to commit first degree murder. "The Supreme Court [in *Swain* and *Cortez*] did not hold that a defendant may not be found guilty of conspiracy to commit murder and also of the substantive offense of murder in the second degree. While any conspiracy to commit murder is necessarily a conspiracy to commit murder in the first degree, as *Cortez* holds, *a person can conspire to commit first degree murder but nonetheless commit a murder under circumstances that were not contemplated and which amount to no more than murder in the second degree.* Indeed, it is possible for a person to conspire to commit a murder and for no murder to occur. Whether a murder that does occur was premeditated or was prompted by circumstances meeting the criteria of second degree murder is a question of fact, not one of law." (*In re E.R.* (2010) 189 Cal.App.4th 466, 470, fn. omitted.)

Thus, the jury's verdict in count II for second degree murder does not mean that defendant could not be convicted of conspiracy to commit first degree murder as a matter of law. In addition, however, the jury's verdict in count II does not mean the evidence that might have supported a conspiracy verdict would have been insufficient as a matter of law. We thus turn to the facts of this case to determine if there would have been substantial evidence to support the jury's verdict for conspiracy to commit first degree murder, if the jury had been properly instructed on express malice.

C. **Analysis**

"[T]he unlawful design of a conspiracy may be proved by circumstantial evidence without the necessity of showing that the conspirators met and actually agreed to commit the offense which was the object of the conspiracy. [Citations.]" (*People v. Zamora*

(1976) 18 Cal.3d 538, 559.) In addition, malice may be, and usually must be, proved by circumstantial evidence. (*People v. Lashley, supra,* 1 Cal.App.4th at pp. 945-946; *People v. James, supra,* 62 Cal.App.4th at p. 277.)

Based on the entirety of the record, particularly Santos's trial testimony and defendant's second statement to the detectives, there would have been substantial evidence to support the jury's guilty verdict for conspiracy to commit first degree murder, separate and apart from the instructional error. Defendant spent several hours at the cemetery with his fellow Norteno gang members, drinking beer and mourning Zayas's brother, who had been killed by a rival gang member. They drove to Zayas's house, where he picked up the gun.

Santos testified that Zayas said, " 'Let's go for a ride,' " and used the term "mobbing." Santos believed that Zayas was "mad, looking for trouble" with South Siders. Santos knew the term "Scrap hunting" meant mobbing with a gun. Santos testified that everyone in the car knew Zayas had a gun. While Santos claimed that Zayas was just looking for a fight, he testified that they all agreed to drive to Orosi to go mobbing and they drove around looking for Scraps. They saw the two men wearing blue, Josh drove past the two men, and Zayas yelled something at them. Santos testified that defendant swore at the two men. The two men yelled something back, and they threw something at Zayas.

The witnesses who were also walking on the street testified that someone in the Honda yelled "SuRat" at the two men in blue. One witness testified that the man in the front passenger seat got out of the car and threw cans at the two men. Defendant was sitting in the front passenger seat, and the officers later found beer cans near the victim's body.

During his second interview with Detective Zaragoza, defendant said that Zayas said, " '[H]ey, f***, let's go look for some Scraps.' " Defendant said they "ran into those guys," and Zayas said they were "Scraps." Defendant admitted that he said, "[F]***

31.

'em" when he saw the two men on the street.  The prosecution's expert testified that such a phrase meant to assault their rivals.  However, defendant made that statement knowing that Zayas had a gun.

It is a close question, but it could be argued that based on the circumstantial evidence, defendant entered into a conspiracy with Josh, Santos, and Zayas to commit first degree murder – to go "Scrap hunting" and murder a Sureno.  The jury could have found defendant guilty of second degree murder by concluding that the actual murder lacked premeditation, deliberation, and willfulness, based on the circumstances of how Josh drove past the two men men in blue, words were exchanged, and then Zayas got out of the car and started shooting.

## III.    CALCRIM No. 400

At trial, the parties did not dispute that Zayas was the gunman.  Defendant was charged with first degree murder as an aider and abettor, and convicted of second degree murder as a lesser included offense.

The jury received the following version of CALCRIM No. 400, on aiding and abetting:

> "A person may be guilty of a crime in two ways:  One, he may have directly committed the crime.  I will call that person the perpetrator.  Two, he may have aided and abetted a perpetrator, who directly committed the crime.

> "A person is *equally guilty* of the crime whether he committed it personally or aided and abetted the perpetrator who committed it."  (Italics added.)

Defendant argues his conviction for second degree murder must be reversed because of the inclusion of the italicized phrase "equally guilty" in CALCRIM No. 400. Defendant argues this phrase has been repeatedly criticized as confusing, and it has been removed from subsequent versions of CALCRIM No. 400.  Defendant further argues the inclusion of the phrase in this case was prejudicial because defendant did not share the

32.

same intent as the gunman, since defendant allegedly did not know that Zayas's gun was loaded or he intended to shoot someone.

The People contend that defendant has forfeited review of this issue since he did not object to CALCRIM No. 400. However, defendant's claim that the instruction misstated the law or violated his right to due process "is not of the type that must be preserved by objection. [Citations.]" (*People v. Smithey*, *supra*, 20 Cal.4th at p. 976, fn. 7; see also § 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.) We thus turn to the merits of defendant's argument.

## A. Aiding and Abetting

As explained above, murder is an unlawful killing committed with malice aforethought. (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) Malice may be either express or implied. (*Ibid.*)

A defendant may be culpable for a crime as a direct perpetrator or as an aider and abettor. To be culpable as an aider and abettor, the defendant must have acted with knowledge of the criminal purpose of the perpetrator, and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 (*McCoy*).)

With respect to the target offense intended by the aider and abettor, the aider and abettor's mens rea is the intent associated with the target offense. (*McCoy, supra,* 25 Cal.4th at p. 1118 & fn. 1.) "Generally, a person who is found to have aided another person to commit a crime *is* 'equally guilty' of that crime. [Citations.]" (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118 (*Lopez*), italics in original.) In some circumstances, however, the aider and abettor may be found guilty of a target offense that is greater or lesser than the offense attributed to the perpetrator, depending on the particular states of mind of the aider and abettor and the perpetrator and the availability of defenses to a particular crime. (*McCoy, supra*, 25 Cal.4th at pp. 1114, 1118-1120; *People v. Nero* (2010) 181 Cal.App.4th 504, 507, 513-517 (*Nero*); *People v. Samaniego* (2009) 172

Cal.App.4th 1148, 1164 (*Samaniego*); *Lopez, supra*, 198 Cal.App.4th at p. 1118.) In the context of a target offense, aider and abettor liability is premised on the combined acts of all the participants, and "on the aider and abettor's *own mens rea*." (*McCoy, supra,* 25 Cal.4th at p. 1120, italics added.)

An aider and abettor may be guilty of a target offense that is lesser than the perpetrator's offense, depending on the aider and abettor's state of mind and the availability of defenses. (See *Nero, supra,* 181 Cal.App.4th at pp. 513-517; *Samaniego, supra,* 172 Cal.App.4th at pp. 1163-1164.) As a result, it has been recognized that the "equally guilty" language in CALCRIM No. 400 can be confusing or misleading. (*People v. Loza* (2012) 207 Cal.App.4th 332, 348, fn. 8 (*Loza*); *Lopez, supra,* 198 Cal.App.4th at pp. 1118-1119 & fn. 5; *Samaniego, supra,* 172 Cal.App.4th at pp. 1163-1165; *Nero, supra,* 181 Cal.App.4th at pp. 510 & 518.) The "equally guilty" language creates the risk that the jury might think that if it finds the defendant in some way aided the perpetrator with the criminal conduct, it necessarily must find the defendant guilty of *the same offense* as the perpetrator, without determining the aider and abettor's particular state of mind. (See *Loza, supra,* 207 Cal.App.4th at p. 356; *Nero, supra,* 181 Cal.App.4th at p. 518; *Samaniego, supra,* 172 Cal.App.4th at p. 1165.)

**B. Analysis**

As defendant correctly points out, the word "equally" has been removed from the "equally guilty" phrase in the pattern instruction on aiding and abetting. (*Loza, supra,* 207 Cal.App.4th 332, 348, fn. 8.) Defendant argues the court erroneously included the phrase in the version of CALCRIM No. 400 given to the jury, and that error requires reversal of his murder conviction. However, even assuming the inclusion of the phrase was erroneous, the record demonstrates that any error was harmless beyond a reasonable doubt pursuant to *Chapman v. California*, *supra*, 386 U.S. 18. (*Samaniego, supra,* 172 Cal.App.4th at p. 1165 [applying *Chapman* test to erroneous inclusion of "equally guilty" in CALCRIM No. 400]; *Lopez, supra,* 172 Cal.App.4th at pp. 1119-1120.)

34.

In this case, the jury received both the general aiding and abetting instruction containing the "equally guilty" language (CALCRIM No. 400), and the more specific instruction (CALCRIM No. 401) that explained in detail the mental state necessary to impose culpability on the basis of aiding and abetting rather than direct perpetration of a crime. CALCRIM No. 401 stated that for defendant to be culpable as an aider and abettor, the prosecution had to prove that the defendant knew "the perpetrator intended to commit the crime," the defendant intended to aid and abet the perpetrator in committing the crime, and the "defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime." CALCRIM No. 401 correctly explained that "[s]omeone aids and abets a crime if he knows of the perpetrator's unlawful purpose, and he specifically intends to and does, in fact, aid, facili[tate], promote, encourage, or instigate the perpetrator's commission of that crime."

More importantly, the verdict in this case indicates that the jury was not confused by the "equally guilty" language. Defendant was charged with first degree premeditated murder with a special circumstance, based on the prosecution's theory that defendant shared Zayas's alleged premeditated, deliberate, and willful intent to kill southerner gang members. The jury found defendant not guilty of the charged offense, and guilty of second degree murder as a lesser included offense, thus rejecting the prosecution's theory that defendant and Zayas shared the same intent.

In addition, this case is dissimilar from *Nero* and *Loza*, which deemed the "equally guilty" language confusing and prejudicial. *Nero* and *Loza* found the inclusion of the phrase was prejudicial because the juries in both cases asked questions during the deliberations which reflected confusion about whether an aider and abettor could have a less culpable state of mind, and the trial courts failed to clarify the confusion. (*Nero, supra,* 181 Cal.App.4th at pp. 507, 510-520 [jurors asked if aider and abettor could be less culpable; court re-read instruction containing "equally guilty" language]; *Loza,*

35.

*supra,* 207 Cal.App.4th at pp. 349, 352, 355-357 [jurors asked if they should consider the aider and abettor's state of mind; court referred jury back to the instructions].)

In contrast, the instructions in this case directed the jury to examine defendant's own particular mental state, and the jury did not ask any questions suggesting it did not fully understand this requirement. The jury was also correctly instructed as to the definitions of willful, premeditated, and deliberate attempted murder, and the mental state of malice. The entirety of the instructions properly informed the jury as to the intent required for aider and abettor culpability. We thus conclude that the inclusion in this case of the phrase "equally guilty" in CALCRIM No. 400 was harmless beyond a reasonable doubt. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1165.)

## IV. <u>Voluntary manslaughter instructions</u>

Defendant was charged with first degree murder, and the jury received instructions on second degree murder as the only lesser included offense. Defendant now contends the court had a sua sponte duty to instruct the jury about both voluntary and involuntary manslaughter as lesser included offenses of second degree murder. In this section, we will address defendant's contentions about voluntary manslaughter.

### A. <u>Sua sponte duty to instruct</u>

"It is, of course, axiomatic that 'in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] ... That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citations], but not when there is no evidence that the offense was less than that charged.' [Citation.] Thus, it has long been settled that the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense. [Citations.]" (*People v. Kelly* (1990) 51 Cal.3d 931, 958-959; *People v. Breverman* (1998) 19 Cal.4th 142, 154-155.)

"The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' [Citation.] 'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 814, fn. omitted, italics in original.)[10]

## B. <u>Murder and manslaughter</u>

As explained above, murder is an unlawful killing with malice aforethought. (§ 187, subd. (a).) Malice is express when the defendant manifests a deliberate intention to take away the life of another. (*People v. Blakeley* (2000) 23 Cal.4th 82, 87, 96.) A defendant acts with implied malice when he acts with an awareness of endangering human life. (*People v. Knoller* (2007) 41 Cal.4th 139, 143, 153.)

Both voluntary and involuntary manslaughter are lesser included offenses of murder. (*People v. Thomas*, *supra*, 53 Cal.4th at p. 813; *People v. Rios* (2000) 23 Cal.4th 450, 460.) "The lesser included offense of manslaughter does not include the element of malice, which distinguishes it from the greater offense of murder. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

---

[10] This is a noncapital case for purposes of appellate review: defendant was charged with first degree murder with a special circumstance, but the prosecutor announced that she would not seek the death penalty, and defendant was ultimately convicted of second degree murder. (See, e.g., *People v. Thomas*, *supra*, 54 Cal.4th at p. 814, fn. 11.)

Malice is presumptively absent, and the crime constitutes voluntary manslaughter, when a defendant, acting with intent to kill or conscious disregard for life, "kills 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), provided that provocation is sufficient to cause an ordinarily reasonable person to act rashly and without deliberation, and from passion rather than judgment. [Citation.] Additionally, when a defendant kills in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury, the doctrine of 'imperfect self-defense' applies to reduce the killing from murder to voluntary manslaughter. [Citations.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1086.)

## C. *Garcia* and *Bryant*

As to voluntary manslaughter, defendant does not contend that lesser included offense instructions should have been given based on either heat of passion or unreasonable self defense. Instead, defendant asserts the trial court had a sua sponte duty to instruct the jury on a new, nonstatutory theory of voluntary manslaughter – a killing committed without malice during the course of an inherently dangerous assaultive felony – because the jury could have found that he did not know of or share Zayas's "murderous intent." Defendant contends that "California courts have recognized a non-statutory form of voluntary manslaughter:  an unintentional killing in the course of an aggravated assault."

Defendant's voluntary manslaughter argument is based on *People v. Garcia* (2008) 162 Cal.App.4th 18 (*Garcia*). In that case, the defendant assaulted the victim with the butt of a gun, causing the victim to strike his head on the pavement and suffer fatal head injuries. Defendant argued he had only meant to hurt the victim and not to kill him. The jury was instructed on murder, and the lesser included offense of voluntary manslaughter based on provocation or imperfect self-defense. The defendant was convicted of voluntary manslaughter. On appeal, the defendant argued the trial court had a sua sponte duty to instruct the jury on *involuntary manslaughter* because there was

substantial evidence the victim was killed without malice, i.e., without an intent to kill or conscious disregard for human life. (*Id.* at p. 26.)

*Garcia* rejected defendant's involuntary manslaughter argument. In doing so, however, *Garcia* stated that "an unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter." (*Garcia*, *supra*, 162 Cal.App.4th at p. 31.)

In *People v. Bryant* (June 3, 2013, S196365) ___ Cal.4th ___ [2013 WL 2372310] (*Bryant*), the Fourth District relied on this language in *Garcia* and held the trial court erred in failing to instruct the jury, sua sponte, that an unintentional killing without malice during the course of an inherently dangerous assaultive felony constituted voluntary manslaughter. (*Bryant*, *supra*, at pp. 2-3.)

When defendant filed his brief in his appeal, he relied on the Fourth District's opinion in *Bryant*. Defendant argued the trial court in this case also had a sua sponte duty to give the same voluntary manslaughter instruction, based on *Bryant*'s interpretation of *Garcia*. At the time that defendant filed his brief, however, the California Supreme Court had granted review in *Bryant* and the case was not citable. (*People v. Bryant*, review granted Nov. 16, 2011, S196365.) Nevertheless, defendant insisted the trial court had a duty to give the same type of sua sponte instruction on voluntary manslaughter as the Fourth District formulated in *Bryant*, and suggested in dicta in *Garcia*.[11]

_____

[11] We note that defendant was tried and convicted in this case in June 2011. The Fourth District filed its appellate opinion in *Bryant* in August 2011, and the California Supreme Court granted review in November 2011. The trial court in this case could hardly have acquired a sua sponte duty to instruct on a theory that was dicta in *Garcia*, had not been raised by defendant, and had not been addressed by an appellate court at the time of defendant's jury trial. As the California Supreme Court has explained, "the *sua sponte* 'rule seems undoubtedly designed to promote the ends of justice by providing some judicial safeguards for defendants from the possible vagaries of ineptness of counsel under the adversary system. Yet the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to

39.

In any event, the California Supreme Court has now issued its opinion in *Bryant*, and rejected the Fourth District's interpretation of voluntary manslaughter and *Garcia*. *Bryant* explained: "A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life – and therefore would normally constitute murder – is nevertheless reduced or mitigated to manslaughter. [Citation.]" (*Bryant*, *supra*, ___ Cal.4th ___ at p. 8.) "Although we have on occasion employed somewhat different formulations to define the offense of voluntary manslaughter, we have never suggested that it could be committed without either an intent to kill or a conscious disregard for life." (*Id.* at pp. 9-10.)

*Bryant* clarified that the court had never held "that a defendant may be found guilty of voluntary manslaughter when he kills unintentionally *and* without conscious disregard for life." (*Bryant*, *supra*, ___ Cal.4th ___ at p. 11.)

> "A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life. To the extent that … *Garcia* … suggested otherwise, it is now disapproved. [¶] Because a killing without malice in the commission of an inherently dangerous assaultive felony is not voluntary manslaughter, the trial court could not have erred in failing to instruct the jury that it was." (*Id.* at pp. 12.)

### D. **Analysis**

Defendant contends the trial court had a sua sponte duty to instruct the jury with *Garcia*'s "nonstatutory" theory of voluntary manslaughter, based on an unintentional killing in the course of an aggravated assault. Defendant argues the jury could have found that defendant did not know or share Zayas's intent to kill even if he knew Zayas

---

discover an abstruse but possible theory of the facts.' " (*People v. Flannel* (1979) 25 Cal.3d 668, 683.)

was armed, and the jury could have found that defendant only intended to aid and abet an aggravated assault and did not appreciate the danger to life.

Defendant's argument is meritless given the California Supreme Court's complete rejection of the Fourth District's interpretation of *Garcia*, and the possibility that such a theory of voluntary manslaughter exists. We thus conclude the trial court in this case did not have a sua sponte duty to instruct the jury on any nonstatutory version of voluntary manslaughter.

## V.     <u>**Involuntary manslaughter instructions**</u>

Defendant separately contends the court had a sua sponte duty to instruct on involuntary manslaughter as another lesser included offense of murder. "Involuntary manslaughter is manslaughter during 'the commission of an unlawful act, not amounting to a felony,' or during 'the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).) 'The offense of involuntary manslaughter requires proof that a human being was killed and that the killing was unlawful. [Citation.] A killing is "unlawful" if it occurs (1) during the commission of a misdemeanor inherently dangerous to human life, or (2) in the commission of an act ordinarily lawful but which involves a high risk of death or bodily harm, and which is done "without due caution or circumspection." ' [Citation.]" (*People v. Murray* (2008) 167 Cal.App.4th 1133, 1140.) There also exists a nonstatutory form of the offense, which is based on the predicate act of a noninherently dangerous felony committed without due caution and circumspection. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007.)

"[C]riminal negligence is the governing mens rea standard for all three forms of committing the offense. [Citations.]" (*People v. Butler, supra*, 187 Cal.App.4th at p. 1007.) Criminal negligence consists of " 'aggravated, culpable, gross, or reckless' conduct that creates a high risk of death or great bodily injury and that evidences a

disregard for human life or indifference to the consequences of the conduct.  [Citations.]"
(*Garcia, supra*, 162 Cal.App.4th at pp. 27-28.)

As explained in section IV, *ante*, *Garcia* addressed whether the trial court in that case had a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense of murder, where the defendant hit the victim in the face with the butt of a shotgun.  (*Garcia, supra*, 162 Cal.App.4th at p. 22.)  *Garcia* clarified that an unlawful killing during the commission of an inherently dangerous felony was not involuntary manslaughter.  (*Id*. at p. 31.)  *Garcia* concluded the court did not have a sua sponte duty to give involuntary manslaughter instructions because the defendant's conduct constituted either assault with a deadly weapon or assault with a firearm, and both offenses were inherently dangerous felonies.  (*Id*. at pp. 22, 31-32.)

Defendant argues that the court should have instructed on involuntary manslaughter in this case because the jurors could have had a reasonable doubt whether defendant knew Zayas was armed with a loaded gun.  Defendant asserts that if he "only intended to aid and abet a simple assault or battery and acted with criminal negligence, he would be guilty of involuntary manslaughter at most."

While *Bryant* rejected the Fourth District's discussion of *Garcia* and voluntary manslaughter, the majority opinion declined to address *Garcia's* analysis of involuntary manslaughter.  (*People v. Bryant, supra*, ___ Cal.4th ___ at p. 12.)  We note that Justice Kennard filed a concurring opinion and found an assault with a deadly weapon can constitute the unlawful act that makes a killing which occurs during the assault an involuntary manslaughter.  (*Id.* at pp. 4-5 [Conc. Opn., Kennard J.].)  Justice Kennard believed "a killing committed during an unlawful act amounting to a felony is involuntary manslaughter, notwithstanding the appearance of the phrase 'not amounting to felony' in section 192's subdivision (b).…"  (*Id*. at p. 6.)  In reaching this conclusion, however, Justice Kennard further found the trial court in *Bryant* did not have a sua sponte duty to instruct on this theory of involuntary manslaughter, because it was based "on a

legal principle that has been so 'obfuscated by infrequent reference and inadequate elucidation' that it cannot be considered a general principal of law. [Citation.]." (*Id*. at pp. 6-7.)

In any event, while a homicide may constitute involuntary manslaughter if it occurs during the commission of a *misdemeanor* inherently dangerous to human life, that definition would not apply in this case. Both assault with a deadly weapon and assault with a firearm are inherently dangerous *felonies*. (*Garcia, supra*, 162 Cal.App.4th at p. 28, fn. 4.) Defendant admitted that he knew Zayas had retrieved a gun, Zayas was angry and upset about his brother's death at the hands of southerners, and defendant agreed with Zayas and the others to drive around and look for southerners. Defendant also admitted that he and his associates carried weapons to feel safe from southerners because of past shooting incidents.

An involuntary manslaughter instruction was not warranted under the facts of this case. An instruction on a lesser included offense is not required if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense. (*People v. Kelly, supra,* 51 Cal.3d at p. 959.) A manslaughter theory requires the killing be committed *without malice (People v. Cook, supra,* 39 Cal.4th at p. 596), whereas the evidence in this case showed implied malice. As explained *ante*, malice is implied " 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation].…" (*People v. Lasko, supra,* 23 Cal.4th at p. 107; *Swain*, *supra*, 12 Cal.4th at p. 602.) A defendant acts with implied malice when he acts with an awareness of endangering human life. (*People v. Knoller*, *supra*, 41 Cal.4th at pp. 143 & 153.)

Defendant's own statements established implied malice in this case. During his second interview with Detective Zaragoza, defendant admitted he knew Zayas was upset about his brother's death, and that Zayas retrieved the gun from his house and returned to

the car with it. Defendant had seen Zayas with a gun on previous occasions, defendant had been shot at by southerners before, and they carried guns to feel safe from the southerners.

When asked who came up with the idea to go mobbing, defendant replied: "Well, we all did but we never thought that that was going to happen." Defendant also said that "mobbing meant they were going to look for someone or just drive around and cruise, and denied that they were looking for Surenos.

On further questioning, however, defendant said that Zayas said they should go mobbing and "look for some scraps." Defendant said they "ran into those guys" who were wearing blue, and Zayas said they were "scraps." Defendant admitted that he said, "[F]*** 'em" when he saw the two men on the street, and Zayas got out of the car and fired the gunshots.

The prosecution's gang expert testified that "mobbing" meant "to get together" in a vehicle, look for a rival gang member, and take action against that person. It was common for gang members to go mobbing and look for their rivals. Detective Sanchez did not know if it was common for gang members to have a weapon while they were mobbing. "Scrap hunting" meant that a Norteno was looking for a rival Sureno. The expert further testified that when defendant saw the two men on the street and said, " '[F]*** 'em,' " such a phrase meant to assault their rivals.

The court did not have a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense of murder. To be culpable as an aider and abettor, the defendant must have acted with knowledge of the criminal purpose of the perpetrator, and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. (*McCoy, supra,* 25 Cal.4th at p. 1118.) Defendant's admission that he made such statements when he knew that Zayas had a gun, Zayas was upset about his brother's gang-related death, and Zayas was looking for "scraps," showed his intent to encourage or facilitate Zayas's intent to kill, and that he acted with an

44.

awareness of endangering human life. (*People v. Knoller*, *supra*, 41 Cal.4th at pp. 143 & 153.)

**VI.** **Substantial evidence of second degree murder**

Defendant contends there is insufficient evidence to support his conviction for second degree murder as an aider and abettor because there is no evidence that he had the requisite malice, he did not take "any concrete action" to assist Zayas (the gunman) as he fired the fatal shots, and defendant's mere presence at the scene does not constitute aiding and abetting.

In section II, *ante*, we set forth the standard of review to determine whether a conviction is supported by substantial evidence. In section III, *ante*, we explained that to be culpable as an aider and abettor, the defendant must have acted with knowledge of the criminal purpose of the perpetrator, and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. (*McCoy, supra,* 25 Cal.4th at p. 1118.)

We have also explained that the trial court did not have a sua sponte duty to instruct on voluntary and involuntary manslaughter as lesser included offenses of murder because defendant, if guilty at all, was guilty of the greater offense of implied malice second degree murder. (*People v. Kelly, supra,* 51 Cal.3d at p. 959.) Malice is implied " 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation].…" (*People v. Lasko, supra,* 23 Cal.4th at p. 107; *Swain*, *supra*, 12 Cal.4th at p. 602.) A defendant acts with implied malice when he acts with an awareness of endangering human life. (*People v. Knoller*, *supra*, 41 Cal.4th at pp. 143 & 153.)

As explained in sections III(D) and IV, *ante*, there is overwhelming evidence to support defendant's conviction as an aider and abettor for second degree murder under an

implied malice theory. We need not restate this analysis and find that defendant's conviction for second degree murder is supported by overwhelming evidence.

In reaching this conclusion, we note that during his interviews with law enforcement officers, defendant sought to present an image of a bystander – one who, by happenstance of residence was left little choice but to be in the company of gang members without actual affiliation with their enterprise, and who just happened to be in the wrong place (Josh's car), with the wrong people (Josh, Santos, and Zayas) at the wrong time (when Zayas murdered the victim). Indeed, there may be slight ring of truth to the defendant's contention about the unfortunate circumstances that led to the tragic events on one fateful day. Yet, while the social conditions that contributed to defendant's decisions may provide some explanation, they do not constitute excuse. Moreover, as the second interview continued, defendant admitted that he knew much more about the events which led up to the murder than he had previously indicated. Indeed, defendant essentially conceded he was not an idle bystander that day. Among other things, we learned from the defendant's police interview, that he was aware of Zayas's purposeful retrieval and possession of a gun that day. Defendant explained that he and his friends had previously been shot at, the shots were fired by Southerners, and that was why he felt they needed to carry weapons. Defendant knew that Zayas was very upset about his brother's murder at the hands of southerners, and that they all agreed to go mobbing. When defendant saw the two men dressed in blue, he yelled out, "F*** 'em," and Zayas started shooting. The consequences of the activities of defendant and his compatriots on the day in question were not fortuitous, and the law imposes accountability on the defendant notwithstanding that he did not pull the trigger.

## VII. <u>The gang enhancement instructions</u>

Defendant was convicted of second degree murder and the jury found the gang enhancement true. Defendant contends the jury's true finding on the gang enhancement must be stricken because CALCRIM No. 1401, which defined the gang enhancement,

omitted elements of the enhancement and "confusingly" referred the jury to other instructions.

As with his other instructional challenges, defendant failed to object to CALCRIM No. 1401, but we will address and reject his contentions.

## A.  **CALCRIM No. 736**

As explained above, defendant was charged with conspiracy to commit murder, and first degree murder with the gang special circumstance (§ 190.2, subd. (a)(22)).  The gang enhancement was alleged as to both counts.  (§ 186.22, subd. (b)(1)(C).)

As to the gang allegations, the jury first received CALCRIM No. 736, which defined the gang special circumstance.

> "The defendant is charged with a special circumstance of committing murder while an active participant in a criminal street gang.  To prove that this special circumstance is true, the People must prove that, one, did defendant intend to kill Arturo Bello.

> "Two, at the time of the killing, the defendant was an active participant in a criminal street gang.

> "Three, the defendant knew that members of the gang engaged in or have engaged in a pattern of criminal gang activity.

> "And four, the [murder] was carried out to further the activities of the criminal street gang.

> "Active participation means involvement with a criminal street gang in a way that is more than passive or in name only.

> "The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang or that he was an actual member of the gang.

> "*A criminal street gang* is any ongoing organization, association, or group of three or more persons whether formal or [informal], one, that has a common name or common identifying sign or symbol.

> "Two, that has as one or more of *its primary activities* the commission of murder, attempted murder, vandalism, terrorist threats,

47.

witness intimidation[,] carjacking, assault with [a] deadly weapon, or entering an inhabited dwelling.

"Three, whose members when acting alone or together engage in or have engaged in *a pattern of criminal gang activity*.

"*In order to qualify as a primary activity*, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.

"*A pattern of criminal gang activity* is [*sic*] used here means, one, the commission of, the attempted commission of, or conviction of any combination of two or more of the following crimes or two or more of the occurrence of one or more of the following crimes:  Murder, attempted murder, or assault with a deadly weapon.

"Two, at least one of those crimes was committed after September 26, 1988.

"Three, the most recent crime occurred within three years of one of the earlier crimes.

"Four, the crimes were committed on separate occasions or by two or more persons.  The crimes, if any, that established a pattern of criminal gang activity need not be established.

"If you find the defendant guilty of a crime in this case, you may consider that crime in deciding *whether one of the group[']s primary activities* was commiss[ion] of that crime and whether a pattern of criminal gang activity has been proved.  You may not find that there was *a pattern of criminal gang activity* unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed.

"Other instructions explain what is necessary for the People to prove that a member of the gang or defendant committed murder, attempted murder, or assault with a deadly weapon."  (Italics added.)

## B.  CALCRIM No. 1401

Immediately after receiving CALCRIM No. 736, the jury received CALCRIM No. 1401, to define the elements of the gang enhancement.  This instruction advised the jury that if it found defendant guilty of the charged offenses, or the lesser included

48.

offense of second degree murder, it had to decide whether, for each crime, "the People have proved the additional allegation" that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang, and "decide whether the People have proved this allegation for each crime and return a separate finding for each crime."

> "To prove this allegation, the People must prove that, one, the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang.
>
> "And, two, the defendant intended to assist, further, or promote criminal conduct by gang members. *A criminal street gang is defined in another instruction to which you should refer*.
>
> "The crimes, if any, that establish *a pattern of criminal gang activity* need not be gang-related. The People need not prove the defendant is an active or current member of the alleged criminal street gang.
>
> "If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's *primary activities* was commission of that crime, and *whether a pattern of criminal gang activity* has been proved.
>
> "The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find the allegation has not been proved." (Italics added.)

The italicized phrase is consistent with one of the options provided by the pattern instruction, if the elements of a criminal street gang are given to the jury in another instruction.

## C. Analysis

Defendant contends the jury was not correctly instructed on the elements of the gang enhancement because CALCRIM No. 1401 omitted the definitions of a gang's "primary activity" and "pattern of criminal gang activity."

We must view the instructions as a whole and determine their correctness from the entire charge to the jury, not from a consideration of one instruction alone. (*People v.*

49.

*Wilson*, *supra*, 3 Cal.4th at p. 943.)  CALCRIM No. 1401 specifically instructed the jury that a "criminal street gang" was defined in "another instruction to which you should refer."  The identity of that other instruction could not have been a mystery, since the court had just read CALCRIM No. 736 to the jury immediately before it read CALCRIM No. 1401.  While CALCRIM No. 736 began with the definition of the elements for the gang special circumstance, that instruction also contained separate and correct definitions of a "criminal street gang," a gang's "primary activities," and the "pattern of criminal gang activity."  The entirety of the instructions thus reflects that the jury was correctly instructed on the elements of the gang enhancement.

Defendant concedes that CALCRIM No. 1401 referred the jury to "other instructions," but asserts that the jury would not have understood that it needed to "look at" CALCRIM No. 736 for the definitions of "primary activities" and "pattern of criminal gang activity," and the jury would have been confused by CALCRIM No. 736's discussion of the gang special circumstance and the active participation requirement for that special circumstance.  The references between the two instructions are clear.  Moreover, defendant did not request clarification of the otherwise adequate instructions, and he may not complain here.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 223.)

Defendant further argues the jury would have been confused by the inclusion of assault with a deadly weapon and conspiracy to commit murder in CALCRIM No. 736's list of predicate offenses, because the gang expert did not testify those offenses were a primary activities, and jury was not otherwise instructed on the elements of assault with a deadly weapon.

The prosecution's gang expert testified the primary activities of the Norteno gang included homicide, attempted homicide, robbery, carjacking, and felony graffiti.  The expert testified about two predicate offenses, based on convictions of Norteno gang members for committing the offense of assault with a deadly weapon on members of the Sureno gang in the Orosi area.  As noted above, defendant did not request clarification of

50.

the otherwise adequate instructions, and he may not complain here. (*People v. Alvarez*, *supra*, 14 Cal.4th at p. 223.) Moreover, any error is necessarily harmless since the parties never disputed the existence of the Nortenos as a criminal street gang, or challenged the evidence about the predicate offenses. (*Chapman v. California, supra*, 386 U.S. at pp. 23-24; *People v. Wilson* (2008) 44 Cal.4th 758, 804.)[12]

## VIII. Sentencing

Defendant contends that the court erroneously calculated his sentence. Since we are reversing count I for instructional error, we will review and modify the sentence for count II.

### A. Background

The probation report stated that the term for count I, conspiracy to commit murder, was 25 years to life, plus a consecutive term of 25 years to life for the firearm enhancement, for a total of 50 years to life. As to count II, second degree murder, the probation report stated the term was 15 years to life, plus 25 years to life for the firearm enhancement, for a total of 40 years to life, but that term should run concurrently to count I.

At the sentencing hearing, the court imposed the indeterminate term of 25 years to life for count I, conspiracy to commit murder, plus a consecutive term of 25 year to life for the section 12022.53, subdivision (d) firearm enhancement, for a total of 50 years to life. As to count II, second degree murder, the court imposed the following sentence:

> "[T]he indeterminate term of 40 years to life *plus, an additional consecutive 25 years to life* pursuant to Section 12022.53(d), *for a total* of 40 years to life.…" (Italics added.)

---

[12] For similar reasons, we also reject defendant's separate contention that the jury's true finding on the section 12022.53, subdivision (e) firearm enhancement must be stricken since that enhancement was based on the true finding on the gang enhancement.

After brief argument from the parties, the court decided to stay the sentence for count II pursuant to section 654, instead of imposing a concurrent term.

The minute order states that the sentence for count II was 40 years to life plus 25 years to life. The abstract of judgment states the sentence for count I was 25 years to life, plus 25 years to life for the firearm enhancement. As to count II, the abstract simply states the sentence was stayed pursuant to section 654.

**B.      Analysis**

As defendant correctly notes, the term for second degree murder is 15 years to life. (§ 190, subd. (a).) The term for the section 12022.53, subdivision (d) firearm enhancement is 25 years to life. (§ 12022.53, subd. (d).) Thus, the correct term for count II should have been 15 years to life, plus 25 years to life, for a total of 40 years to life. When the court imposed the sentence for count II, it erroneously stated that the sentence was 40 years to life, and also that the sentence was 40 years plus 25 years to life.

Given our reversal of count I based on instructional error, the matter must be remanded for a determination of whether defendant will be retried for count I. If defendant is not retried for count I, then the court must correct the abstract of judgment to strike the conviction and sentence for count I, and further reflect that defendant was sentenced to 15 years to life for count II, plus 25 years to life for the firearm enhancement, for an aggregate term of 40 years to life. The court must also lift the stay originally imposed for count II.

**DISPOSITION**

Defendant's conviction in count I for conspiracy to commit murder is reversed for instructional error.

The abstract of judgment is ordered corrected to reflect that defendant's sentence for count II is 15 years to life plus 25 years to life for the firearm enhancement, for an aggregate term of 40 years to life.

If defendant is not retried for count I, the court is ordered to lift the stay originally imposed for count II.

_____
Poochigian, J.

WE CONCUR:


_____
Wiseman, Acting P.J.


_____
Gomes, J.